UNITED STATES of America

v.

72.71 ACRES, More or Less, Situate IN MONTGOMERY COUNTY, State of MARYLAND, and John C. Webb, et al.

No. 8628.

United States District Court
D. Maryland,
Civil Division.

Dec. 23, 1957.

Leon H. A. Pierson, U. S. Atty., Martin A. Ferris, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Custer & Seegmiller, Gaithersburg, Md., for defendants.

CHESNUT, District Judge.

This was a federal land condemnation case wherein the United States of America condemned 13 acres in fee simple and important easements in 22 additional acres of land belonging to John C. Webb and wife, situated in Montgomery County, Maryland. The case was instituted December 5, 1955. On October 29, 1956 John E. Oxley, a member of the bar of this court, entered appearance for the property owners. The trial of the case occurred on October 22, 23 and 24, 1957. It was actively and well tried by Martin A. Ferris, Assistant United States Attorney for this District, for the Government, and by Mr. Oxley for the property owners. The contention of the Government with respect to the amount of "just compensation" was that the property was worth not more than $10,000; while the property owners were contending for a much larger sum of about $40,000. By written inquisition the jury returned a verdict of $14,000. On November 1, 1957, Mr. Oxley filed an order striking out his appearance as counsel for the property owners as of October 28, 1957. On November 1, 1957 Messrs. Custer and Seegmiller, who had not theretofore been counsel in the case, as attorneys for the property owners filed a motion for a new trial on only general grounds that the verdict was contrary to the evidence and for irregularities in the trial, and obtained an order for the postponement of the hearing of the motion until they could obtain a transcript of the record of the case from the court reporter.

On November 25, 1957 the new attorneys filed a more specific motion for a new trial on the grounds (1) of improper conduct of the jury and counsel for the Government and (2) a statement by the Government witness, Beasley, of the purchase price which the defendants paid for their property. On December 6, 1957 counsel for the parties were heard in open court on the motion. There was submitted at that time an affidavit of John C. Webb with respect to the circumstances of the trip by bus of the jury to visit the property and there was also submitted the affidavit of Mr. Ferris with regard thereto and the oral testimony of Gerald F. Bracken, the Marshal of the Court and the statement of Arthur J. Robertson, a deputy clerk of the court for 31 years, regarding the practice in condemation cases where the jury were required to visit and inspect the property.

The principal contention of counsel for the property owners in support of the motion for a new trial was based on the fact that Mr. Ferris had ridden in the bus with the jury who were going to inspect the property, and returned on the bus to Baltimore and thus the jury *may* have been subtly and indirectly favorably influenced by the Assistant United States Attorney as to the Government's valuation of the property. The principle relied on by counsel for the property owners is indeed a sound one that where a party to a case or his counsel has created a situation whereby incidental and unnecessary courtesy and hospitality is *privately* furnished to a juror, during which there is a possibility of influence being exerted either intentionally or unintentionally, the necessity for keeping a jury verdict above suspicion should require the granting of a new trial even though the moving party is not able to prove actual influence on the juror. I think all Judges would agree that this is a sound principle but under all the evidence in this case, I find no merit in the contention that such a principle should be here applied.

In the first place, it is important to know what has been the uniform procedure and practice in land condemnation cases in this court for 30 years or more past, in the hundreds of such cases in which juries have been required. On the first day of a trial the jury is impanelled, a comparatively short opening statement is made by counsel for the respective parties explaining in only a general way what is the property that is involved, and the purpose for which it is taken and where it is located. It is necessary for the jury to be taken to the

property to inspect it and its surroundings in its location. The tranportation is furnished by the Marshal of the Court and where the property is distant, as in this case fifty miles or more from Baltimore, the means of transportation is in a bus containing, in this case, at least 24 seats. The jury are told that they will be taken in a bus to visit and see the property in the custody of the Marshal and as they will be away the best part of a day a luncheon will be provided for them at a nearby place, by the Marshal of the Court. The jury are also told that when they see the property a representative of each of the parties will be on hand to point out to them the boundary lines of the property to be condemned; but that nothing will be said by the representatives of the parties regarding the value of the property or the just compensation to be determined by the jury; and that all the evidence to be considered by them in reaching their own figure as to just compensation will be that submitted to them in court in the usual way by testimony on the next day after their return from seeing the property, and that their valuation should be based on what they hear in court and their own personal view of the property.

As there are accommodations in the bus for more than the 12 jurors and the Marshal and his deputy, counsel for the parties can go along with the jury to visit the property if they desire. And it is expected that counsel for both parties can, if they wish, accompany the jury in the bus to and from the property. It is, of course, important for the proper and efficient trial of the case by counsel for the parties that they should at least be present at the site of the property when the jury inspect it and when the representatives of the parties familiar with the boundary lines of the property are there to explain to the jury where the lines run.

In the instant case both Mr. Webb and his counsel, Mr. Oxley, understood this from the proceedings in court before the jury went to visit the property, and it appears from Mr. Webb's affidavit that he and Mr. Oxley intended to go in the bus with the jury as well as Mr. Ferris and Mr. Gianakos, his assistant. The Marshal and the bus were ready in the parking area in the Court House Building and Mr. Webb and Mr. Oxley understood this, but apparently misunderstood exactly where the bus would start from. When the jury and the Marshal went down to the bus and found Mr. Webb and Mr. Oxley not there, the Marshal held the departure of the bus until Mr. Gavin, the deputy marshal, went back to the court room to try to find them. Not being able to find them after a considerable time of waiting, the Marshal directed the bus to go on. It did so and arrived at the luncheon place about the same time that Mr. Webb and Mr. Oxley arrived there, having proceeded in Mr. Webb's automobile. At the luncheon place only two tables were provided. The majority of the jury sat at one table while the Marshal, his deputy, Mr. Ferris, Mr. Gianakos, his assistant, Mr. Webb, Mr. Oxley and the remainder of the jury sat at another table. There was in fact no conversation of any kind regarding the property at the luncheon. After the luncheon Mr. Oxley and Mr. Webb were invited to ride in the bus to the property, but volunteered to lead the way in their own automobile. On the property, in the usual way, the boundary lines were pointed out to the jury on behalf of the respective parties. After the jury had finished their inspection of the property the bus, as usual, returned to Baltimore by a slightly different route. Mr. Webb and Mr. Oxley residing nearby, preferred to remain and not return to Baltimore as they had the opportunity to do if they desired, with the jury in the bus.

There is no evidence whatever to show that at any time during the bus trip, going or coming, the Marshal, Mr. Ferris or Mr. Gianakos had any personal or individual conversation with any member of the jury regarding the property in any way. As a matter of fact Mr. Ferris sat with the Marshal in one,

404

of the seats of the bus some little distance away from the jurors.

It was suggested by counsel for the property owners in support of the motion for a new trial that the circumstances were such that the jury may well have inferred that Mr. Ferris was the "host" on this occasion. This is an unreasonable inference. The expense of taking the jury to the property, including the luncheon, was paid by the Marshal, under an order of court from funds appropriated by the federal government for jurors expenses in the federal courts and, of course, the funds therefore come from taxes paid by individual taxpayers, probably including all the jurors and counsel and other taxpayers.

Counsel for the property owners expressly disclaim that there was anything on the part of the jury or counsel to affect the result of the trial in any way. In substance, the only fact relied upon by them is that Mr. Ferris did ride in the bus with the jury to and from the property. This was certainly not in any way showing private courtesy or hospitality by him or by the Marshal to any of the jurors. And the presence of Mr. Ferris in the bus was, like that of the Marshal, a necessary means of going to the property; and the property owners and their counsel knew that the bus was also provided for their accommodation and they were expected to go with the jury but missed the bus by their own failure to inquire as to its exact starting place. The bus was furnished by the Marshal in accordance with the uniform practice in such matters and as an incident necessary to jury service.

In supposed illustration of the principle relied on by counsel for the property owners, they have cited a number of decisions from various States, including Lynch v. Kleindolph, 204 Iowa 762, 216 N.W. 2, 55 A.L.R. 745; LaValley v. State, 188 Wis. 68, 205 N.W. 412; Village of Bangor v. Hussa Canning & Pickle Co., 208 Wis. 191, 242 N.W. 565.

■ I have considered these cases and find the facts therein very different from the instant case. In most,

if not all, of the cases cited, there was *private and individual* courtesy and hospitality offered to and accepted by a juror during which a representative of one of the parties entertained one of the jurors, although without evidence to show that anything was said about the pending cases. The principle involved is that where a juror is thus *privately* entertained, even though innocently, it is ground for a vacation of the verdict and a new trial, if made promptly after first discovery. The principle, while sound in its application to particular factual situations involved in the cases cited, would be misapplied here if used to defeat a verdict resulting from a full and fair trial on the merits of the case. It would indeed, in my opinion, be a misapplication in defeating an otherwise proper verdict under the facts here appearing.

No argument is submitted by counsel for the property owners that the verdict of the jury was not supported by the evidence in this case, nor is there any argument that the amount of just compensation as determined by the jury is inadequate on the evidence. As will appear from the charge of the court in this case, the important issue before the jury was whether the land taken should be valued on an agricultural basis as farm land where its highest utility was for agriculture, or whether, on the other hand, it should have been valued, as the property owners contend, for purposes of "development", that is, for retail sales of lots for residential purposes. On this issue the jury's own inspection of the land and the nearby surrounding lands, was doubtless very important in determining what was the highest utility of the property. That was a factual situation plainly visible to the eyes of the jurors and only as to which it is reasonable to assume that they were or could reasonably be thought to have been influenced subtly by the mere proximity of the Marshal and counsel for the United States in the same bus.

■ Furthermore, the facts now made the basis of argument for a new trial were well known on the first day of

the trial, to the property owners and their counsel. With full knowledge of this, Mr. Oxley had ample opportunity during the remaining two days of the trial, to call the matter to the attention of the court if he had felt, as he apparently did not at the time feel, that the circumstances justified a mistrial of the case. I think it is too late now for newly employed counsel, who did not in any way participate in the case, to raise this point. Wiltsey v. United States, 4 Cir., 222 F.2d. 600; Fishbaugh v. Armour & Co., 4 Cir., 185 F.2d 541.

■ In connection with the alleged misconduct of Mr. Ferris, counsel also urge that in addressing the jury he improperly referred to the figure of $23,000 as the original purchase price by the property owners for the whole of their property consisting of 198 acres. I have examined the stenographer's transcript with regard to this and find it affords no substantial reason for granting a new trial in view of the context in which the reference was made.

■ In the opening statement Mr. Ferris on the first day of the trial in general explanation of the subject matter, pointed out the whole of Mr. Webb's property consisted of 198 acres which had been purchased some years before for $23,000. Mr. Oxley, for the property owners, objected thereto and the court ruled that it could not be determined until during the testimony whether the date of purchase was too remote from the date of taking by the Government to make it admissible. When, on the second day of the trial during the taking of testimony of one witness for the Government, a reference was made to this figure as the original purchase price, Mr. Oxley objected and after some further inquiry as to time the court sustained the objection. The reference made by the witness Beasley, an expert appraiser called by the Government, is also made the basis for a motion for a new trial on the ground that the witness showed bias by making an unnecessary reference to the particular figure. The argument now made by new counsel is that this bias of the witness created

such harm that it could not be repaired without a new trial. In the Court's charge to the jury a general reference was made to the fact that in considering the weight of the testimony of any witness the jury should consider also any bias that he might have displayed in the matter. I do not think there is any real substance in the present contention; but if it had been thought by Mr. Oxley, the trial counsel at the time, that there was, a motion for a mistrial should have been made at that time. I think it is entirely too late for new counsel to make this point more than a month after the trial had been concluded.

Again it is urged that Mr. Ferris in a later argument to the jury again referred to the figure of $23,000. A reading of the transcript on that point would seem to indicate that the reference was really incidental; but in any event it appears that the court noted the mistake and in effect told the jury to disregard it.

For all these reasons I conclude that the motion for a new trial should be and it is hereby *overruled* this 23rd day of December, 1957.