STATE, Respondent, v. SCHWEIDER, Appellant.

*November 7, 1958—January 2, 1959.*

628

For the appellant there was a brief and oral argument by *Nathaniel D. Rothstein* and *Paul C. Konnor,* both of Milwaukee.

For the respondent there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and *David Weber,* district attorney of Sheboygan county, and oral argument by *Mr. Platz* and *Mr. Weber.*

HALLOWS, J. The defendant assigns as error the overruling of his challenge to the testimony of Senglaub, the prosecuting witness, for the reason that the witness was mentally incompetent and had no respect for the truth. The court allowed in evidence the official record of the county court of Sheboygan county in the guardianship proceedings of Senglaub in which a guardian was appointed for him on January 22, 1957, on the ground he was an incompetent. The defend-

ant stated he was prepared to aid the trial court and to offer medical testimony in support of his objection. The court stated that if it subsequently developed that the court would like medical testimony it would advise counsel. The court then conducted a *voir dire* examination of Senglaub under sec. 325.30, Stats., and found him competent to testify.

Testimony of the witness shows some confusion about details and a forgetfulness, probably not too unusual in a man eighty-six years of age. The inconsistencies in his testimony do not give rise to the inference that he consciously testified falsely. On the *voir dire* his answers were generally responsive and correct. He understood his obligation to tell the truth and the difference between right and wrong, and comprehended the nature and obligation of the oath.

A witness may be competent to testify although in some respects he is mentally unsound or has some mental impairment, but where a witness is so impaired that he does not understand the obligations of an oath or has no respect for the truth, he is not competent. Short of such substantial total impairment, an infirmity goes to the credibility of the testimony and not to the competency of the witness. Competency has two aspects: (1) The mental capacity to understand the nature of the questions and to form and communicate intelligent answers thereto; (2) the moral responsibility to speak the truth, which is the essence of the nature and obligation of an oath.

The trial court is generally in a better position to judge the competency of the witness than the appellate court. In this case the trial judge had some twenty years' experience in dealing with aged people while serving as county judge. The determination of competency is for the trial court and will not be reversed unless clearly and manifestly wrong. The above rule as to competency of a mentally impaired witness has been laid down in this state in *Burns v. State* (1911), 145 Wis. 373, 128 N. W. 987; *Pawlak v. Pelkey* (1918), 167 Wis. 367, 167 N. W. 427; *Markowitz v.*

*Milwaukee E. R. & L. Co.* (1939), 230 Wis. 312, 284 N. W. 31; *Hancock v. Hallmann* (1938), 229 Wis. 127, 281 N. W. 703. The trend of the cases indicates there is little question of the competency of a mentally deficient witness if he is capable of appreciating the nature of an oath and able to answer questions with a reasonable degree of accuracy. Anno., Mental Condition as Affecting Competency of Witnesses, 148 A. L. R. 1140. The rationale of this rule is explained in *District of Columbia v. Armes* (1882), 107 U. S. 519, 2 Sup. Ct. 840, 27 L. Ed. 618.

The discrepancies pointed out by the defendant in the testimony of the witness at the trial and with testimony given prior thereto go to the question of credibility after the witness' competency has been established. It was for the jury to accept such parts of the contradictory testimony as it believed. *DeGroot v. Van Akkeren* (1937), 225 Wis. 105, 273 N. W. 725. It is better in cases of mental deficiency to let the jury reject the nonsense and accept such sense as is evident than to disqualify all testimony on the ground of incompetency. 2 Wigmore, Evidence (3d ed.), p. 594, sec. 501.

The record shows the witness understood what he was saying and the obligation of the oath. He desired to speak the truth; he believed in God and that he would be punished if he lied. We conclude there was no error in finding the witness competent to testify.

While it was possible at any time during the trial for the court to reverse itself if it believed it had made a mistake and to hold the witness incompetent in view of his later testimony, the court did not do so and the defendant did not move to strike out the testimony on the ground the witness had demonstrated his incompetency. *State v. Moorison* (1953), 43 Wash. (2d) 23, 259 Pac. (2d) 1105; *State v. Zeezich* (1922), 61 Utah, 61, 210 Pac. 927.

The defendant cannot complain that the trial court did not admit medical testimony on the *voir dire* examination. While

the court has the discretion to allow such evidence to aid him, and such is the implication in *State v. Wrosch* (1952), 262 Wis. 104, 53 N. W. (2d) 779, the defendant here did not make a proper offer of proof of such evidence at the time of the *voir dire* or at any time thereafter. The court was determining the competency of the witness who was not on trial and whose insanity, if any, was not an issue as such.

In his second assignment of error the defendant claims the evidence does not support the verdict. A detailed discussion of the evidence would extend this opinion to an unwarranted length. The conviction stands on the following facts and reasonable inferences which the jury could well draw therefrom.

On May 4, 1957, the prosecuting witness, George Senglaub, eighty-six years of age, was digging potato holes with a fork in his garden, in the village of Waldo. He heard a noise and looking up saw the defendant with a club upraised. Senglaub testified the defendant struck him, knocked him to the ground, and continued to flail him on both hands. After he regained consciousness he walked to his house and called for help. His testimony as to the time of the assault is conflicting but the most probable time is around 2:30 o'clock in the afternoon. Mrs. Ford, a neighbor to the west of Senglaub, found him and summoned other neighbors for help. At that time Senglaub was in bad shape and was bleeding from a puncture wound in his left elbow. One hand was bloody and both hands were swollen and out of shape. There were black-and-blue marks around his neck and he had welts on his right arm which were swelling and discoloring. He was in a state of shock. He was removed to a hospital, where he remained until June 8, 1957.

Mrs. Ford, shortly after discovering Senglaub, went to the defendant, who lived immediately to the south of Senglaub, and asked him and his wife to come over to see what had happened to Senglaub. The defendant and his wife re-

fused to go, stating they preferred to remain on their own property.

The sheriff was summoned by one of the neighbors and in the course of their investigation found signs of a scuffle in the garden and drops of blood on the walk leading to the back door of Senglaub's house and into the kitchen.

The defendant's testimony was to the effect that neither he nor his wife was on Senglaub's property on the day of the alleged assault or had seen or heard Senglaub that day. The defendant had been working in his back yard on a car, about 10 feet from the Senglaub property line, during the day. The defendant, when interviewed by the sheriff, denied all connection with the assault and maintained his innocence throughout the trial.

The day following the alleged attack the defendant, while on bail, appeared at the hospital with his wife and brother at the request of the district attorney and was identified by the prosecuting witness. At first Senglaub pointed to the defendant's brother and later, after putting on his glasses, pointed out the defendant.

There was testimony that the reason the defendant and his wife did not go over to Senglaub's home when Mrs. Ford requested them was that Senglaub was an irresponsible person who had made false accusations against the defendant and they preferred to remain on their own property and not become involved.

Testimony also showed Senglaub, a week prior to the alleged assault, attempted to strike the defendant's mother with a cane without provocation, and also on one occasion attempted to strike the defendant with a shovel. Senglaub had accused the defendant of stealing some tools and Senglaub was regarded by the defendant as being a crazy man and a nuisance. There was also testimony the defendant had made an offer to purchase the home of Senglaub, which apparently fell through when relatives of Senglaub had a

guardian appointed for him. There was also testimony, disputed by the defendant, that a bad relationship between the defendant and Senglaub existed for about two years prior to the alleged assault.

There were no eyewitnesses to the assault and, although a search was made of Senglaub's and of the defendant's property, no club or other instrument was identified or put in evidence as the instrument used in the alleged attack. Medical testimony was to the effect that Senglaub was badly injured, with fractures of both forearms, severe contusions and abrasions about the arms, shoulders, and face, and with a puncture wound on his left elbow. The fractures, two in the right forearm and one just below the left elbow, were of a type unlikely to be received in a fall. The defense was based on the theory that the injuries sustained by Senglaub had existed prior to the day of the attack or he had received them in a fall. There was testimony that the injuries could not have been received prior to May 4th and their nature is consistent with Senglaub's testimony that his assailant was hammering and clubbing away at him as he lay on the ground.

The case against the defendant is logical and sufficiently strong and credible to convince a jury beyond a reasonable doubt. There are some inconsistencies and some vagueness in Senglaub's testimony but these were within the province of the jury to weigh and decide. The verdict of conviction was approved by the trial judge, who stated the jury was intelligent, conscientious, and honest and was a good cross section of the people of the community. From a review of all the records we believe there was sufficient evidence for the jury to convict the defendant.

The defendant questions the sufficiency of the inquiry of the defendant's sanity under sec. 957.13, Stats. The psychiatrist appointed by the court did not make a written

report but testified under oath the defendant had personality problems but these were not sufficient in degree to warrant commitment to a mental hospital. While the doctor's testimony did not go into the tests and criteria of sanity sufficient to enable the defendant to stand trial, this objection was not raised by the defense nor did the defense cross-examine the doctor. After trial, counsel for the defendant maintained the defendant was sane and should be free on bond.

The defendant claims the record does not disclose a proper oath was administered to the doctor. There is no affirmative evidence in the record that the doctor did not take an oath before he examined the witness. After his examination of the defendant the expert did take an oath as a witness before he testified. A written report was not required by the court. The court waited for the doctor to make his examination of the defendant in the attorneys' room at the courthouse and to testify. The requirement of an oath in sec. 957.27 (1), Stats., before a medical expert examines the defendant refers to situations where the expert witness is going to make a report to the court. Where, however, the expert witness is not required by the court to make a written report under oath as provided in sec. 957.27 (4), there would seem to be no reason for the oath. Here the court was proceeding in a summary manner under sec. 957.13, and appointed the expert medical witness to examine the defendant so such medical witness could testify and aid the court in its inquiry of the defendant's mental condition. Under sec. 957.13, where no written report is requested by the court, an oath before examination is not required where the expert takes an oath as a witness before he testifies.

Defense counsel did not question the defendant's sanity at any time. It was District Attorney Weber who was assiduously performing his duty when he directed the court's attention to the defendant's mental condition. Defense counsel

is precluded from raising the issue of the defendant's sanity on this appeal because the alleged error was not raised in the trial court. A defendant is presumed to be sane until credible evidence proves otherwise. Compare *State v. Vinson* (1955), 269 Wis. 305, 68 N. W. (2d) 712, 70 N. W. (2d) 1. The mere fact of an inquiry or advice as to the probability of the insanity of the defendant does not overcome the presumption. The defense counsel if he believed the defendant insane should have at least cross-examined the medical witness. It should be pointed out that counsel on appeal was not the trial counsel. The testimony showed the defendant did not need commitment; he merely had personality problems. There is nothing in the record which even tends to show the defendant's mental condition rendered him incapable of conferring with his counsel on his own behalf or to distinguish between right and wrong. See *Wilson v. State* (1956), 273 Wis. 522, 78 N. W. (2d) 917.

Defendant contends the trial court heard a *habeas corpus* proceeding and the preliminary proceedings in this case together as one matter. The record does not bear this out. Proceedings were had July 30th when the defendant appeared specially to object to the jurisdiction of the court on the ground that the written testimony taken before the magistrate was not filed in the trial court and the bind-over was not complete. At this time the information against the defendant was filed. On August 2d there was another hearing when the district attorney moved for an order to take depositions under sec. 326.06, Stats., of the prosecuting witness and of one Timmer, age eighty-three. The defendant again appeared specially. The transcript of these hearings is entitled in this action. The court reporter inserted the words "hearing on writ of *habeas corpus* July 30, 1957, a. m. in open court." However, the record shows no proceedings on a writ of *habeas corpus*.

The petition for the writ is not in the record but it was not dated until September 26, 1957. The writ was issued the same day, returnable October 4th, at which time there was a hearing. On that date it was stipulated the evidence in this action could be considered a part of the *habeas corpus* proceeding. The order of the trial judge denying the petition for the writ of *habeas corpus* was dated October 30th. This was captioned in this case instead of the *habeas corpus* proceeding. The record further shows proceedings in this case the following day on October 31st. The district attorney and the defense treated the *habeas corpus* proceeding as a separate action. Moreover, a trial judge who hears a *habeas corpus* proceeding testing the sufficiency of the evidence on the bind-over does not thereby disqualify himself from hearing the criminal proceeding nor must he disqualify himself from hearing the criminal case for that reason.

The defendant claims error in the trial court's admitting the deposition of Henry Timmer on the ground of remoteness. The deposition dealt with a visit by the defendant and his wife to the Timmer home approximately four months before the alleged offense. During the conversation the defendant's offer to purchase Senglaub's property came into the conversation. Timmer told the defendant he virtually stole the property and thereupon the defendant became angry with Timmer. This deposition was to the point that the defendant accused Timmer of spoiling a deal of the defendant to purchase the prosecuting witness' house. It was offered on the theory that it tended to show such animosity of the defendant toward Senglaub as to want to get him out of the neighborhood by purchasing Senglaub's property. We believe there was sufficient materiality between the evidence in the deposition and the offense for which the defendant was being tried to form a basis of intent, design, or motive within the rule of *Herde v. State* (1941), 236 Wis.

408, 295 N. W. 684. Even if not relevant or material any error in its admission was not prejudicial.

Did the trial court commit error in permitting the state on rebuttal to introduce evidence concerning the defendant's bad relations in the community for neighborliness? This evidence did not take the form of testimony as to reputation as contended by the defendant. The testimony complained of was introduced on rebuttal by the state to refute the defendant's testimony of good relations with his neighbors in one or two instances. The defendant's counsel inquired into the relations between the defendant's family and the prosecuting witness. On cross-examination the defendant's wife said there were good relations with other neighbors. The defendant testified his relations with other neighbors were all right prior to May 4th, and he got along with all neighbors, including the prosecuting witness. On rebuttal the state, over objection of the defendant, asked a witness, who was a neighbor, what the general neighborliness was between the defendant and the other neighbors. The witness testified it was hard to have any friendship with the defendant; that he was not very sociable. Another neighbor testified that the defendant was uncommunicative and very hard to talk to and did not have any trouble until a year or two ago. On the basis of impeachment there was no error in admitting this testimony.

We conclude that the trial court committed no error and the conviction and judgment should stand.

*By the Court.*—Judgment affirmed.